IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

EQUAL EMPLOYMENT OPPORTUNITY :
COMMISSION,                        :
                                   :
    Plaintiff,             :
                                   :
v.                                 :     CIVIL ACTION NO.
                                   :     2:13-CV-00225-RWS-JCF
FANNIN COUNTY, GEORGIA,            :
                                   :
    Defendant.             :

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendant's motion for summary judgment. (Doc. 36).   For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion be **GRANTED.**

## PROCEDURAL HISTORY

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed this action on September 30, 2013, alleging that Defendant Fannin County, Georgia ("Defendant," "Fannin County," or "the County") terminated Donnie Green ("Green") and Weldon Thomas ("Thomas"), former Fannin County Road Department employees, pursuant to a November 2011 reduction-in-force ("RIF") on the basis of age, in violation of the Age Discrimination in Employment Act of

1

1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*[1]   (*See* Doc. 1).   The EEOC seeks: a permanent injunction enjoining Defendant "from engaging in any employment practice that discriminates on the basis of age against individuals 40 years of age and older"; an "Order [directing] Defendant to institute and carry out policies, practices and programs that provide equal employment opportunities for individuals 40 years of age and older and that eradicate the effects of its past and present unlawful employment practices"; a judgment requiring Defendant to pay Donnie Green and Weldon Thomas back wages, liquidated damages, and prejudgment interest; and an award of the EEOC's costs.   (*Id.* at 5-6).   Defendant answered (Doc. 3), and discovery proceeded.

Defendant has now filed a motion for summary judgment (Doc. 36), with supporting brief (Doc. 36-1), a statement of undisputed material facts (Doc. 36-2), and exhibits (Doc. 36-3, Doc. 39).[2]   Plaintiff filed a brief in response to Defendant's motion (Doc. 42), a statement of material facts (Doc. 42-1), a response to Defendant's statement of undisputed material facts (Doc. 42-24), and

---

[1] Green and Thomas did not file charges of discrimination with the EEOC, intervene in this action, or file a separate action.   Other Fannin County Road Department employees who were laid off—Darrell Alsobrook, Lucas Burk, Larry Goss, Tommy Loudermilk, Michael Kirkland, and Gene Ware—filed a separate action in which they also allege that the RIF violated the ADEA.   *See Alsobrook, et al. v. Fannin County*, 2:13-CV-267-RWS-JCF.   The undersigned has addressed Fannin County's motion for summary judgment in that case by separate Report and Recommendation.

[2] Doc. 39 is a corrected copy of Defendant's Exhibit B filed as part of Doc. 36-3.

exhibits (Docs. 42-3 through 42-23).  Defendant submitted a reply brief (Doc. 53) and a response to Plaintiff's statement of material facts (Doc. 54).  With briefing complete, the undersigned turns to the merits of Defendant's motion.

## FACTS

The facts, for summary judgment purposes only, are derived from Defendant's statement of undisputed material facts (Doc. 36-2, "Def. SMF"); Plaintiff's statement of material facts (Doc. 42-1, "Pl. SMF"); Plaintiff's response to Defendant's statement of undisputed material facts (Doc. 42-24); Defendant's response to Plaintiff's statement of material facts (Doc. 54); and uncontroverted record evidence.[3]  Many of the facts are taken from the depositions of witnesses involved in the events underlying this lawsuit, including Charles H. Collins (Doc. 44, "Collins Dep."), Garnett Pearson Webb, Jr. (Doc. 45, "Webb Dep."), Larry Joe Sosebee (Doc. 46, "Sosebee Dep."), Phillip C. Collis (Doc. 47, "Collis Dep."), Rita Davis Kirby (Doc. 48, "Kirby Dep."), Susan L. Hayes (Doc. 49, "Hayes Dep." and Doc. 50, "30(b)(6) Hayes Dep."), William C. Simonds (Doc. 51, "Simonds Dep."),

---

[3] The undersigned notes that the parties' presentations of the facts set forth in their respective statements of facts and responses thereto made the Court's task of determining the relevant and material facts difficult, in light of the numerous objections to the materiality of the asserted facts and the frequently selective citation to deposition testimony.  (*See generally* Docs. 36-2, 42-1, 42-24, and 54).  The undersigned has therefore gone beyond the parties' statements to determine whether genuine issues of material fact exist.

Donnie Green (Doc. 56, "Green Dep."), and Weldon Thomas (Doc. 57, "Thomas Dep.").[4]

The undersigned has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. Yet the court need not "scour the record" to make that determination. *Tomasini v. Mt. Sinai Med. Ctr. of Fla.*, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (internal quotation omitted). The facts are construed in the light most favorable to Plaintiff as the non-movant. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001).

Fannin County's largest department is the Road Department and employs approximately 50 full-time employees. (Def. SMF ¶ 1; Collis Dep. at 12; Collins Dep. at 13). The Road Department is responsible for building, paving and maintaining roads, installing pipes and culverts, mowing grass, cleaning out ditches, cutting trees after storms, maintaining county vehicles, and performing erosion and sedimentation work, including putting up silt fences. (Def. SMF ¶ 2; Simonds Dep. at 13-14; Collis Dep. at 15). The Road Department employs several kinds of employees, including laborers, bush hog (large mower) operators, motor grader operators (who operate graders that scrape dirt roads to make them level),

---

[4] Some of these witnesses were also deposed in the *Alsobrook* case, but the parties here have only cited to the depositions filed in this case, and the undersigned has limited his consideration of the evidence to the depositions and exhibits the parties submitted in this case.

paving machine operators, backhoe and track hoe operators, roller operators, truck drivers, and mechanics.  (Pl. SMF ¶ 3; Collis Dep. at 13, 19-21, 28).  Job openings are not generally posted; instead hiring to fill positions in the Road Department is accomplished through "word-of-mouth" and by reviewing applications kept on file.  (Simonds Dep. at 28-30).

Charlie Collins (born in 1949), has been the Superintendent of Fannin County's Road Department from 2009 to the present.  (Def. SMF ¶¶ 7-8).  He is the highest-ranking employee in the Road Department.  (Def. SMF ¶ 9).  Phillip Collis (born in 1949), has been the Shop Foreman in the Road Department for over 25 years.  (Def. SMF ¶¶ 13-14; Pl. SMF ¶ 4).  Collis reports to Collins.  (Def. SMF ¶ 15; Pl. SMF ¶ 5).  Collins reports to William Simonds (born in 1939), who has been the Chairman of the Fannin County Board of Commissioners since 2009. (Def. SMF ¶¶ 16-17; Pl. SMF ¶ 6).  As Chairman, Simonds manages all of the departments except for "constitutional" offices, and he has the power to hire and fire employees, including at the Road Department.  (Pl. SMF ¶ 7; Def. resp. to Pl. SMF ¶ 7; Simonds Dep. at 22, 27).  At the time of the 2011 layoffs at issue in this case, the two Post Commissioners were Garnett Webb and Larry Joe Sosebee.  (Pl. SMF ¶ 8).

Fannin County maintains a Personnel Policy and Procedures manual (*see* Doc. 51-4), which includes an anti-discrimination policy prohibiting, among other

things, "discrimination against an applicant or employee because of . . . age between 40 and 60 years." (*Id.* at 4). Chairman Simonds testified that Susan Hayes, the County's Human Resources Manager, made him "aware of what age discrimination is," which is "doing something to somebody on account of their age," i.e., "40 and above," and he understands that he cannot "fire somebody on account of their age." (Simonds Dep. at 69-71). Road Superintendent Collins and Shop Foreman Collis also understand that they cannot discriminate against an employee because of his age. (Collins Dep. at 13; Collis Dep. at 127).

The County also has a retirement policy[5] which allowed employees who retired to continue working for the County and receive their retirement benefits, but that policy was amended effective January 1, 2012 so that employees who retired after that date but continued to work for the County were required to defer receiving their retirement benefits until after they stopped working for the County.[6] (*See* Docs. 51-9, 51-10, 51-16; Simonds Dep. at 142-43; Hayes Dep. at 46-47).

The budgeting process for the County's following year budget begins in July when Rita Kirby, the County's Financial Director, sends out notices to the

---

[5] The parties have not precisely identified the eligibility requirements for the County's retirement plan, but benefits appear to be based on age and years of service, with full vesting at 30 years of service. (*See* Hayes Dep. at 63-64; *see also* Doc. 49-8).

[6] Ms. Hayes testified that she brought the amendment to the County's attention because she believes Fannin County was "the only county in the State of Georgia that had a plan where you could actually continue working and draw your county retirement and your Social Security." (Hayes Dep. at 44).

department heads to let them know the County is beginning to draft the next year's budget.  (Def. SMF ¶ 48; Pl. SMF ¶ 30).  Once Kirby sends out the notices, the department heads respond by indicating how much money they want for the following year.  (Pl. SMF ¶ 31).  Upon receiving the department's budget requests, Kirby submits that information to the Commissioners, which must be done by the first of September.  (Kirby Dep. at 16-17).  Then Kirby and Chairman Simonds review the numbers, consider the revenue, contact the department heads to let them know if they will have the money for a certain line item or take that item out of the budget.  (Kirby Dep. at 18).  The goal is to prepare a budget that the County can present to the public for review and public hearing and approval by the Commissioners.  (Kirby Dep. at 19-20).

In order to determine the amount of money that will be available to the County for the following year's budget, the County estimates the next year's revenue by comparing the revenue coming in for the current year with the revenue that came in at the same point during the previous year.  (Def. SMF ¶¶ 45-46; Pl SMF ¶ 32).  Because the revenue numbers can change from month to month, the projected revenue for the following year's budget is adjusted accordingly throughout the process.  (Def. SMF ¶ 47).  Kirby described the budget process as "back and forth," with fluctuations of "a million to 2 million off" of projected revenue for a given month.  (Kirby Dep. at 22).

7

A large portion of revenue for the general fund comes from property taxes, which are collected in December of the tax year and January of the next year. (Pl. SMF ¶ 35). Kirby assumes for budget purposes that the County will collect 95 to 100 percent of the property taxes owed. (Pl. SMF ¶ 37). Other sources of revenue include the federal government's payments in lieu of taxes, local option sales tax (i.e., the County's portion of sales taxes), franchise taxes, and ad valorem taxes (i.e., "birthday taxes"). (Kirby Dep. at 26-27, 46-49). Additionally, the County receives funds through a Special Purpose Local Option Sales Tax ("SPLOST") for use by the Road Department. (Kirby Dep. at 28). Simonds described it as a "guessing game" trying to determine how much the County has to spend the next year, based on the estimates of the taxes to be collected. (Simonds Dep. at 95).

The line item for the Road Department in the budget does not come close to what it actually costs to operate the Road Department. (Pl. SMF ¶ 50). What Fannin County spends on the Road Department is a combination of the Public Roads column in the General Fund budget plus some amount of the SPLOST funds. (Pl. SMF ¶ 51). SPLOST funds can be used only for the Road Department, including its salaries. (Pl. SMF ¶ 52). Kirby described a "balancing act" the County engages in to determine how much of the County's general fund and the SPLOST funds to cover the Road Department's expenses, including paving and maintaining roads, salaries, insurance, and benefits: "You can't really tell from one

8

year to the next depending on what kind of monies are coming in for SPLOST and what monies are going out for paving.  You have a lot of different factors that go into doing the funding on that and the balancing act on that."  (Kirby Dep. at 29-30).  There are also variables that affect how much SPLOST money the County uses to reimburse the general fund, including state contracts for helping out with paving and what the matching funds will be for those contracts, but the priority remains that the County maintains enough money in the SPLOST accounts to be able to pave roads it has planned to pave.  (Kirby Dep. at 31).

Simonds also reviews Fannin County's general fund and departmental budgets every week to see what is being spent, and he can determine whether a department, including the Road Department, has gone over its budget. (Simonds Dep. at 35-36).  If so, he communicates with the department head about what to do to keep costs down, such as questioning why certain supplies are being purchased. (Simonds Dep. at 37).  Although Simonds does not always tell a department to lay off employees if it has gone over budget, sometimes layoffs are "the only avenue." (Simonds Dep. at 38-39).  Simonds explained that Fannin County "is a poor county," and while officials try to cut everything they can such as waiting on making repairs rather than lay off employees, "[w]hen it gets dire," i.e., the County is "running out of money," the County will lay off employees.  (Simonds Dep. at 38-39).  Simonds prefers to cut personnel "before the crisis," and instead of

9

borrowing money or raising taxes.  (Simonds Dep. at 39-40).  Collins recalled that during every weekly meeting Simonds held with the department heads since Collins began working there, Simonds told them "to cut [their] spending down, hold down the spending," that was "hammered in relentlessly."  (Collins Dep. at 31).

The Road Department began conducting seasonal layoffs during the winter months when Chairman Simonds assumed office.  (Def. SMF ¶ 10; *see also* Doc. 42-17; Simonds Dep. at 32).  In 2009, the layoff took place from February 8, 2009 to April 6, 2009; in 2010, the layoff took place from January 4, 2010 to April 27, 2010; and in 2011, the seasonal layoff took place from January 3, 2011 to April 4, 2011.  (Def. SMF ¶¶ 11, 12; *see also* Doc. 42-17).  Simonds would tell Collins "see who you could get by without for a little while until the budget gets back on track, and then we would bring them back."  (Collins Dep. at 43).  In determining which employees to lay off during these seasonal layoffs, Collins consulted Collis about the employees they could spare during the down time.  (Collins Dep. at 22).

Collins selected employees for the layoffs by considering:

(a) who performed mostly seasonal work (such as mowing, Bush Hogging and running a motor grader) as opposed to others who were cross-trained on equipment used regularly year round;

(b) who held certifications in skills such as flagging, soil and water erosion control,[7] or who held commercial drivers licenses; and

(c) who had volunteered to be on after-hours call-in list indicating a willingness to come in for emergencies like cutting down trees or clearing roads during storms.

(*See* Collins Dep. at 21-22, 32-36, 40, 44-46, 52-54).

 Donnie Green, who operated a motor grader (*see* Doc. 44-4), was included in the 2009, 2010, and 2011 seasonal layoffs, and Weldon Thomas, who operated a side-arm bush hog (*see id.*), was included in the 2010 and 2011 seasonal layoffs. (*See* Doc. 42-17).

Simonds worked with Kirby on drafting the budget for Fannin County in 2011.  (Pl. SMF ¶ 133).  Based on optimistic revenue estimates, the proposed expenditures for the 2012 general fund budget were increased, including the Road Department budget, which increased from $1,386,658 in the draft budget to $2,569,658 in the final 2012 budget.  (Pl. SMF ¶ 34).  Sometime in the fall of 2011, after the budget had been published,[8] Kirby learned that County revenue was approximately $1.5 million lower than had been projected, and the County was not

---

[7] Collis explained that anyone who is "disturbing any kind of ground" has to have a soil and water erosion control certificate or "blue card."  (Collis Dep. at 22-23). Although the EPD-EPA only requires one blue card per crew, Simonds requires all employees who are working on erosion and sedimentation to get one.  (Collis Dep. at 23; Simonds Dep. at 24-26).  The department sends any employee whose job involves earth moving, i.e., "anything from putting up silt fences to the actual building of the road," to obtain the certification.  (Collis Dep. at 24).

[8] The budget was published prior to September 13, 2011, when the first public hearing on the budget was scheduled.  (*See* Doc. 48-11).

going to make the amount budgeted in the 2012 budget for the general fund. (Kirby Dep. at 44-45, 50-51).  Kirby explained that the reduced revenues could have come from several sources, including property taxes, SPLOST, or payment in lieu of taxes.  (Kirby Dep. at 45).  One area that stood out to her was the County's collection of its sales tax, which was approximately three-quarters of a million dollars short, and the collection of "the birthday taxes," i.e., the ad valorem tax vehicle owners pay on their birthdays, and insurance tax collection was down. (Kirby Dep. at 46-50).

Kirby discussed the shortage with Simonds, and they "started looking for places to save money" and "were looking at several different options of ways to save money."  (Kirby Dep. at 49, 52, 77).  Simonds understood that the County "had a million dollars in uncollected taxes" and was "way behind" in the money to be collected, which required the County to cut costs.[9]  (Simonds Dep. at 40, 108-

---

[9] Plaintiff asserts that in discussing uncollected taxes, Simonds was only discussing uncollected property taxes, and that he "admitted that the amount of the uncollected property taxes actually improved from 2009 to 2010 and from 2010 to 2011."  (Pl. resp. to Def. SMF ¶ 53).  Those assertions fail to create an issue of fact on whether Simonds believed as of November 4, 2011, when the layoffs occurred, that the County's revenue was falling short of projections and required cuts in spending.  In the first place, Simonds' testimony is not limited to property tax collection; he simply references "uncollected taxes." (*See* Simonds Dep. at 40, 108-09).  Kirby testified that the revenue shortfall appeared to result from a variety of sources, including collection of the County's sales tax, i.e., the non-SPLOST local option sales tax, as well as other revenue sources.  (Kirby Dep. at 45-50). Moreover, the tax reports Plaintiff relies on to support its assertion that the collection of property taxes improved from 2009 to 2010 and from 2010 to 2011

09).  Kirby "suggested we try to do something to save money, whatever that may be," and one of the ways she and Simonds came up with to save money was to refinance the bond on the courthouse and jail.  (Kirby Dep. at 52-53, 71, 73; Simonds Dep. at 80, 114, 137).  Kirby explained that the refinancing allowed the County to forego making a bond payment that year of about a million dollars, so the Count "took [the] savings all up front in anticipation of being short of money that year."[10]  (Kirby Dep. at 72).  The refinancing of the courthouse bond was approved by the Board of Commissioners on November 8, 2011, four days after the layoffs at issue in this case.  (Def. SMF ¶ 87).  Chairman Simonds also testified, and the minutes of the Commissioner's October 27, 2011 meeting reflect, that the County took other cost-saving measures, including cutting EMS overtime,

---

indicated collection of taxes through December 31st of those years.  (*See* Doc. 42-14).  As recounted above, Simonds' and Kirby's concerns about declining revenue occurred prior to the end of the year; it is undisputed that revenue subsequently came in better than expected by the end of December 2011 and beginning of January 2012.  (*See* Pl. SMF ¶ 40).

[10] Plaintiff takes the position that Kirby's testimony that the County was "short of money" "could suggest that expenses went up, not necessarily that there was an issue with revenues."  (Pl. resp. to Def. SMF ¶ 89).  That interpretation is wholly disconnected from Kirby's testimony that the County decided to refinance the courthouse as a way to save money after realizing that revenues were not coming in as expected.  (*See* Kirby Dep. at 49, 52-53, 71, 73, 77).  Moreover, even if money was "short" due to expenses going up, that is still an issue of not having enough revenue to pay for those expenses, which would require either increased revenue or decreased expenses or both in order to balance the budget.  As Chairman Simonds explained, he was against borrowing or raising taxes, i.e., methods that could increase revenue, so he required cuts in expenses.  (*See* Simonds Dep. at 39-40).

changing the way that emergency services were sent to respond to emergencies, waiting to buy new equipment, and laying off employees at the Road Department. (Simonds Dep. at 80, 111-114, 136-140; Doc. 51-15).

Simonds also believed that there were problems with the Road Department's ability to meet its budget and that it needed to cut expenses before the end of 2011 as well as for 2012.  (Simonds Dep. at 79-80).  He did not want to wait until things reached a "crisis point," so he directed the Road Department to cut expenses. (Simonds Dep. at 79). Simonds told Collins and Collis that the Road Department had to cut "not only employees," but "everywhere they could." (Simonds Dep. at 41).  Simonds explained in his deposition that the County had cut as much as it could in other departments and already had employees doing multiple jobs, so "the only place left . . . to cut [was] the road department," which was over budget. (Simonds Dep. at 41-42, 78-79).

Simonds did not tell Collins and Collis how many employees they needed to lay off in 2011 (Simonds Dep. at 35, 48; Collins Dep. at 43), but Simonds' general instructions for layoffs were "[t]o see who you could get by without for a little while until the budget gets back on track, and then we would bring them back." (Collins Dep. at 43-44).  Simonds did not give Collins any instructions on how to select employees for the layoff, the focus was "more or less seasonal, or who [he] could get by with for a few weeks."  (Collins Dep. at 44).  Collis also testified that

14

Collins and Simonds asked him, "How many people that would have to be cut if they cut people back, how many would you have to have for the bare minimum to keep all the other jobs functioning."  (Collis Dep. at 86).  Collins consulted with Collis about what some of the Road Department employees did, and Collins used the same criteria for selecting employees for the November 2011 layoffs as he had for the previous seasonal layoffs, i.e., whether the employee primarily operated seasonal equipment he could do without during the winter or was cross-trained on other equipment, had certain certifications or licenses, or volunteered for the call-in list to be available after hours for removing downed trees or clearing snow off roads.  (*See* Collins Dep. at 21-22, 32-36, 40, 44-46, 52-54).  Simonds, Collis, and Collins also discussed which of the employees had indicated an intention to retire, and Collis identified Donnie Green as an employee who had indicated that he was going to retire in April 2012 on his birthday.  (Collins Dep. at 50; Collis Dep. at 42-43; *see also* Green Dep. at 12).  Wages and seniority were not factors in determining who to lay off.[11]  (Collins Dep. at 51; Collis Dep. at 88).

With respect to Donnie Green and Weldon Thomas, the two employees whose termination give rise to the EEOC's ADEA claim, Collins testified about the reasons he included those men for the November 2011 layoff.  First, as to

---

[11] Collis testified that he would have made the layoff decisions based on seniority, and there were some people who he did not want to be laid off, but it was not his decision.  (Collis Dep. at 88, 91).

15

Donnie Green, Collins testified that he included Green in the layoff list because he was going to retire in the spring, he was not cross-trained on equipment other than the motor grader, he was not on the call-in list, and he did not have any certifications such as in flagging or silt fence installation.[12]   (Collins Dep. at 37, 52-53).   Green's deposition testimony also supports Collins' reasons: he testified that he had been planning on retiring in April 2012 when he turned 65 and had communicated that intention to Ms. Hayes, he did not operate any equipment other than a motor grader and did not want to learn another machine, he did not have a blue card or CDL, and he knew about the call-in list, but he did not want to sign up because he did not want to work after hours.   (Green Dep. at 12, 14-17, 29-30).

Collins also explained that he selected Weldon Thomas because as far as Collins knew, Thomas had "never done anything besides run the Bush Hog," which is equipment used to mow grass and therefore not used as much during the

---

[12] Collins said that the Road Department maintained one or two motor graders during the winter because they can be used to put down base and as snow plows, but those operators "also operate other pieces of heavy equipment."   (Collins Dep. at 35-36).   Thus, Plaintiff's assertion that Green, who did not "also operate other pieces of heavy equipment," "could have used his motor grader in the winter time" (*see* Pl. resp. to Def. SMF ¶ 69) is insufficient to create an issue of fact on whether Collins believed that the Road Department could do without Green during the winter.   The undersigned also notes that Green testified to the difficulties of using a motor grader during the winter because "[a]ll you do is burn the blades up trying to cut, you know.   If it's wet, it don't do nothing but make a mud hole."   (Green Dep. at 34; *see also* Collis Dep. at 128 (explaining that the motor grader cannot scrape if the dirt road is wet)).

winter, and Thomas was also not on the call-in list.[13]  (Collins Dep. at 34, 39, 52-53).  Thomas admitted during his deposition that from 2000 until he was laid off, he was on the bush hog "unless it was broke down," and he did not want to be on the call-in list because "[w]hen [he] went home in the evening, [he] always had other things to do."  (Thomas Dep. at 10-11, 54-55).

After Collins developed the list of employees to include in the layoff, he (and possibly Collis) gave Simonds the list, and Simonds approved that list without reviewing any documents, getting anyone's advice, considering the relative abilities of the employees, or making any changes to the list.[14]  (Simonds Dep. at

---

[13] Plaintiff's assertion that Thomas "was proficient enough on the bush hog to work in the winter time" because the bush hog was operated during the winter time before Simonds became the Chairman (Pl. resp. to Def. SMF ¶ 69) fails to controvert Collins' perception that Thomas's services as a bush hog operator were not as useful to the department during the winter as other employees.

[14] Plaintiff asserts that "Collins did not make the list up on his own and present it to Simonds; rather, Simonds and Collins came up with the list after meeting with Collis."  (Pl. resp. to Def. SMF ¶ 73 (citing Collis Dep. at 67-68); *see also* Pl. resp. to Def. SMF ¶ 74). It is uncontroverted that Collis provided input concerning the job duties of the employees in his department.  Collis's testimony does not support Plaintiff's apparent assertion that *Simonds* "came up with" the layoff list (as opposed to simply approving the list provided by Collins). Collis testified that he went to a meeting with Collins and Simonds before the layoffs where they had a list of employees and asked Collis about roughly 20 of them, i.e., what jobs certain employees performed (*see* Collis Dep. at 67-69, 113-115), but he did not testify that that was the list of persons who were laid off.  (*See id.*).  In fact, when Plaintiff's counsel showed Collis a copy of the list of employees he was asked about during that meeting, he testified that it was not a list of people being laid off, but was a "list of everybody, and they started calling names off, and I told them what they done."  (Collis Dep. at 113-115; *see also* Doc. 47-8).  Collins was also shown a copy of that list during his deposition and testified that it was not the list

48-50, 57-58, 71, 76, 81-82).  Collins testified that when he gave the list to Simonds, he was "not sure if all of them are going to be laid off or not, so we just proposed a list of here's who we think we can get by with for a little while, and that was it."  (Pl. SMF ¶ 85).  Collins said that Simonds made the final decision, and he did not know who was laid off until it happened.  (Pl SMF ¶ 86).  It is undisputed that Chairman Simonds made the final decision with respect to the individuals to lay off as part of the 2011 RIF.  (Def. SMF ¶ 75).  Collis, the Shop Foreman, found out who would be laid off a couple of days to a week before November 2011 layoffs occurred.  (Pl. SMF ¶ 104).  Someone brought him a list of names, and there were people on the list who he did not want laid off, but it was not his decision.  (Pl. SMF ¶ 105).

On November 4, 2011, Fannin County laid off eleven employees from its Road Department: Kenneth Dye (age 43 at time of layoff), Michael Kirkland (47), Darrell Alsobrook (52), Willie Burk (57), Tommy Loudermilk (61), Donnie Green (64), Lucas Burk (64), Larry Goss (65), Weldon Thomas (65), Ernie Sellers (66), and Gene Ware (71).  (Def. SMF ¶¶ 76-77; Pl. SMF ¶¶ 1, 127-28).  Another employee, Bobby Bright (67) was laid off in December 2011.  (*See* Doc. 42-9 at 6-7; Doc. 42-10).  Susan Hayes, the Human Resources Manager, issued a notice to

---

of people he provided to Simonds to lay off.  (Collins Dep. at 70-71; Doc. 44-4).  It is not clear whether Collins' list is in the record.

employees who were laid off that explained that "due to budget cuts your employment with Fannin County is being terminated." (Doc. 51-8).

Some of the employees laid off in November and December 2011 had been temporarily laid off during the seasonal layoffs in 2009, 2010, and/or 2011, including Michael Kirkland, Darrell Alsobrook, Donnie Green, Lucas Burk, Larry Goss, Weldon Thomas, Gene Ware, and Bobby Bright. (Pl. SMF ¶ 65; *see also* Doc. 42-17). Each time they had been laid off, they were called back several months later. (Pl. SMF ¶ 66). Collins initially believed that the layoffs would be seasonal and did not find out until November that they were permanent, although discussions the month before suggested that they could be permanent (Collins Dep. at 28-31). Ms. Hayes' assumption when she wrote the memo given to each employee who was laid off was that they were being laid off permanently based on "hearing that the budget was in pretty bad shape." (Hayes Dep. at 38).

Toward the end of December 2011 or early 2012, County revenues started coming in better than expected, so the budget did not need to be adjusted. (Pl. SMF ¶ 40). Kirby explained that "it was an influx of bills coming in for tax bills being paid," the County had "payments coming in from the different areas of the County that had not been paid . . . like they had in the previous year," it had payments in lieu of taxes coming in from the federal government, and the County also had a good holiday season which bolstered revenue from the sales tax. (Kirby

Dep. at 65).  County employees received raises that had been approved in the 2012 budget. (Pl. SMF ¶¶ 61-62).  The Road Department also hired new employees or re-hired some laid-off employees in the first few months of 2012.  (*See* Doc. 44-3). Between January 2012 and April 2012, the County re-hired Darrell Alsobrook (born in 1959) as a truck driver; re-hired Willie Burk (born in 1954) as a truck driver; hired Kent Foster (born in 1952) as a truck driver; hired Jason Allen (born in 1973) for the silt fence crew; hired Hoyt Green (born in 1975) as a laborer; hired Timothy M. Lail (born in 1973) as a bush hog operator; hired James Walden (born in 1969) as a laborer; hired Benny Weaver (born in 1956) as a laborer; and hired Arnold Y. Winkler (born in 1982) as a laborer.  (*Id.*).  Collins testified that many of the people hired in the first months of 2012, seven or eight of them comprising two to three crews, were hired to comply with EPD-EPA requirements relating to silt fences and building check dams or holding ponds.[15]  (Collins Dep. at 59-60, 68).

Green never inquired after he was laid off whether there were any job openings at the Road Department, but he told Collis one day, "it would be nice to be back, but I don't reckon I'd come back."  (Green Dep. at 22, 27-28).  He retired

---

[15] Plaintiff asserts that the County already had a silt fence crew at the time of the layoff (*see* Doc. 42 at 24-25), but that would not preclude the County from hiring additional crews.  Plaintiff also points out that a County document showing who was hired in 2012 "shows that only 1 of the 11 new hires in 2012 was for silt work."  (*Id.*; *see also* Doc. 44-3).  While the referenced list shows that Jason Allen was hired for a silt fence crew, Collins testified that a silt fence crew also consists of other workers, including a backhoe or track hoe operator and a laborer.  (Collins Dep. at 19, 59).

when he turned 65 in 2012 and "want[s] to stay retired." (Green Dep. at 20-21).

Thomas also did not contact anyone to ask if there were any job openings after he

was laid off. (Thomas Dep. at 70). Thomas had retired from the County and

continued to work and receive retirement benefits under the County's pre-2012

retirement policy before he was laid off. (Thomas Dep. at 71-72). Commissioner

Sosebee got in touch with him after he was laid off and asked him if he would be

willing to come back to the County, and Thomas said he "probably would."

(Thomas Dep. at 71). Sosebee later told Thomas, "We're considering it if you'll

give up your retirement to come back to work," and "[y]ou can reinstate [your

retirement benefits] when you decide to retire" (Thomas Dep. at 71), which was

consistent with the County's amended retirement policy in effect as of January 1,

2012 (*see* Docs. 51-9, 51-10, 51-16; Simonds Dep. at 142-43; Hayes Dep. at 46-

47). Thomas told Sosebee that he was not interested in returning to work "under

those terms." (Thomas Dep. at 71).

## DISCUSSION

## I.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a). "A party asserting that a fact cannot be or is

genuinely disputed must support that assertion by[] . . . citing to particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact.  *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986); *see also Arnold v. Litton Loan Servicing*, *LP*, No. 1:08-cv-2623-WSD, 2009 U.S. Dist. LEXIS 119787, at *10 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999)).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  *See Celotex*, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' "  *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992*); see also* FED. R. CIV. P. 56(c)(1)(B), (c)(4).   The evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan*, 932 F.2d at 1577.  Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  *See Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984).

For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter.  *Id.* at 249, 255.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255.

## II.    **Plaintiff's ADEA Claim**

Plaintiff contends that Fannin County unlawfully discharged employees Weldon Thomas, who was 65 when he was laid off, and Donnie Green, who was 64 when he was laid off, because of their ages, in violation of the ADEA. (Doc. 1).

## A.   Analytical Framework For ADEA Claims

The ADEA provides in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's age."  29 U.S.C. § 623(a)(1); *see also Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1270 (11th Cir. 2014) ("The ADEA, whose purpose is 'to promote employment of older persons based on their ability rather than age,' 29 U.S.C. § 621(b), prohibits certain actions by an employer, including the termination of, or deprivation of employment opportunities against, an employee who is at least 40 years old because of that employee's age." (citing 29 U.S.C. §§ 623(a)(1)-(2), 631(a))).

"A plaintiff may support a claim under the ADEA through either direct evidence or circumstantial evidence."  *Mazzeo*, 746 F.3d at 1270. "To ultimately prevail, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.' "  *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167,

24

177-78 (2009)).  In *Gross*, the Court rejected the application to ADEA claims of the burden-shifting scheme used in Title VII mixed motive cases, i.e., if the plaintiff presents evidence that an impermissible characteristic played a motivating factor in the employment decision, the burden of persuasion shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action in the absence of the impermissible motivation.   557 U.S. at 171-74. Instead, the Court observed that, unlike Title VII, the text of the ADEA does not authorize a mixed-motive age discrimination claim, and held that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action," and "[t]he burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.* at 173-80.

Thus, "[t]he ADEA requires that 'age [be] the "reason" that the employer decided to act.' "  *Mora v. Jackson Mem. Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (quoting *Gross*, 557 U.S. at 176). "Because an ADEA plaintiff must establish 'but for' causality, no 'same decision' affirmative defense can exist: the employer either acted 'because of' the plaintiff's age or it did not."  *Id.* (citing *Gross*, 557 U.S. at 180); *see also Smith v. CH2M Hill, Inc.*, 521 Fed. Appx. 773,

774-75 (11th Cir. 2013) (unpublished decision) (explaining that it is not sufficient to allege that age "substantially motivated" the challenged employment decision, rather "[a]n age discrimination claim under the ADEA . . . requires that age be the but-for cause of the termination"); *Avera v. Airline Pilots Ass'n Int'l*, 436 Fed. Appx. 969, 978 (11th Cir. 2011) (unpublished decision) ("Although a Title VII plaintiff may prove his case by showing that his membership in a protected class played a 'motivating part' in the employment decision, an ADEA plaintiff must prove that age was the 'but for' cause of the employer's adverse decision," i.e., "the ADEA does not permit a 'mixed-motive' claim for disparate treatment." (citing *Gross* and *Mora*)); *Collins v. Fulton Cnty. Sch. Dist.*, No. 1:12-CV-1299-ODE-JSA, 2012 U.S. Dist. LEXIS 187392, at *45 (N.D. Ga. Dec. 26, 2012) ("Under the ADEA, a plaintiff must ultimately prove at trial that age was a 'determinative factor' in the employment decision, or, in other words, that the decision at issue would not have occurred absent the age discrimination.' "), *adopted in part and modified in part on other grounds by* 2013 U.S. Dist. LEXIS 46388 (N.D. Ga. Feb. 27, 2013).

"Where, as here, a plaintiff proffers circumstantial evidence to establish an ADEA claim, [the courts] apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Mazzeo*, 746 F.3d at 1270 (citing *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332-33 (11th Cir. 2013)). "Under

this framework, a plaintiff must first establish a *prima facie* case of age discrimination." *Id.* (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)). "If he does so, the burden of production shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for the challenged employment action.' " *Id.* (quoting *Chapman*, 229 F.3d at 1024). "If the defendant articulates at least one such reason, the plaintiff is then given the opportunity to show that the employer's stated reason is merely a pretext for discrimination." *Id.* The Eleventh Circuit has made clear that courts continue to apply the *McDonnell Douglas* evidentiary framework to ADEA claims even after the Supreme Court's decision in *Gross* because the burden of *persuasion* never shifts to the employer under that framework. *See Sims*, 704 F.3d at 1332-33.

The Eleventh Circuit has cautioned, however, that "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed Martin*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* The court explained that "[a] triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury

to infer intentional discrimination by the decisionmaker.' " *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).  Although *Smith* involved race discrimination claims brought under Title VII and 42 U.S.C. § 1981, the Eleventh Circuit has explained that, although the *McDonnell Douglas* framework applies to ADEA cases, "that framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case."  *Sims*, 704 F.3d at 1333 (citing *Smith*, 644 F.3d at 1328).  "Instead, 'the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.' "  *Id.* (quoting *Smith*, 644 F.3d at 1328.

### B. *McDonnell Douglas* **Analysis**

#### 1. *Prima Facie* **Case**

"[A] plaintiff may establish a *prima facie* case for an ADEA violation by demonstrating that: (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified to do the job; and (4) he was replaced by or otherwise lost a position to a younger individual."  *Mitchell v. City of Lafayette*, 504 Fed. Appx. 867, 870 (11th Cir. 2013) (unpublished decision).  The fourth prong can also be satisfied by a showing that the employer "treated employees who were not members of the [plaintiff's] protected class more favorably under similar circumstances."  *Washington v. UPS*, 567 Fed. Appx. 749,

751 (11th Cir. 2014) (unpublished decision). The courts "have modified the plaintiff's *prima facie* burden where he was terminated as part of a[] RIF, such that the plaintiff must make a showing that: (1) he was in a protected age group; (2) he was adversely affected by an employment decision; (3) he was qualified for his current position or to assume another position at the time of discharge; and (4) the evidence could lead a factfinder reasonably to conclude that the employer intended to discriminate on the basis of age." *Mitchell*, 504 Fed. Appx. at 870. "The variant test alters the fourth prong of the *McDonnell Douglas* test, that a person outside the protected class replaced the plaintiff, because, in RIFs, employers rarely seek replacements for the discharged employee." *Id.*

Relying on the RIF *prima facie* case formulation, Defendant contends that the EEOC cannot make out a *prima facie* case "because the record does not permit the conclusion that the county intended to discriminate on the basis of age when it included Green and Thomas in the 2011 RIF." (Doc. 36-1 at 5). The EEOC contends that RIF formulation is not appropriate or necessary because Fannin County did not eliminate any positions. (Doc. 42 at 18 n.2). Instead, it asserts that it can establish a *prima facie* case because Thomas and Green were over the age of 40; they were discharged; they were qualified for their jobs; and "they were replaced by substantially younger individuals." (*Id.* at 17-18). Specifically, the EEOC contends that Green, who was 64 at the time of the 2011 layoffs, was

replaced immediately by Wade Green, age 57, and later by Hoyt Green, age 37, and Thomas, who was 65 when he was laid off, was replaced immediately by Scott Johnson, age 43, and Mark Eckels, age 35.  (*Id.* at 18).

The undersigned finds it unnecessary to determine which *prima facie* formulation is appropriate and will assume for the sake of discussion that the EEOC has at least created an issue of fact on whether it has met its burden of establishing a *prima facie* case for purposes of summary judgment.  As discussed below, however, the undersigned finds that the EEOC has not created a genuine issue of fact concerning whether Defendant's articulated legitimate, non-discriminatory reasons for terminating Donnie Green and Weldon Thomas during the November 2011 layoffs were pretext for age discrimination.

### 2.   Defendant's Articulated Legitimate, Non-Discriminatory Reasons For Employment Decisions

The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion.  *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1331 (11th Cir. 1998).   This burden is "exceedingly light."  *Turnes v. Amsouth Bank, N.A.*, 36 F.3d 1057, 1060-61 (11th Cir. 1994) (internal quotation omitted).  Here, the County made two decisions that led to the termination of Donnie Green and Weldon Thomas in November 2011: (1) the decision to conduct the November 2011 layoffs, and (2) the decision to include Green and Thomas in those layoffs.  As to Defendant's decision to conduct

the layoffs, Defendant has presented evidence that Fannin County Chairman William Simonds determined in the fall of 2011 that due to a decrease in revenues from what had been estimated, i.e., a million dollars in uncollected taxes, the County needed to find ways to cut expenses, and that one of the ways that the County cut expenses was to effectuate a layoff of employees from the County's largest department, i.e., the Road Department, which he considered to be "over budget." (*See* Simonds Dep. at 40-45, 47, 78-80, 108-09, 11-14, 136-40).

With respect to Defendant's decision to include Green and Thomas in the November 2011 layoffs, Defendant has presented evidence that Road Department Superintendent Collins identified the employees who would be included in the layoff after consulting with Shop Foreman Phillip Collis, and then using the same criteria he had used previously for conducting seasonal layoffs.  Collins selected employees for the layoffs by considering:

> (a) who performed mostly seasonal work (such as mowing, Bush Hogging and running a motor grader) as opposed to others who were cross-trained on equipment used regularly year round;
>
> (b) who held certifications in skills such as flagging, soil and water erosion control, or who held commercial drivers licenses; and
>
> (c) who had volunteered to be on after-hours call-in list indicating a willingness to come in for emergencies like cutting down trees or clearing roads during storms.

(*See* Collins Dep. at 21-22, 32-36, 40, 44-46, 52-54).

Specifically as to Donnie Green, Collins testified that he included Green in the layoff list because Green was going to retire in the spring, he was not cross-trained on equipment other than the motor grader, he was not on the call-in list, and he did not have any certifications such as in flagging or silt fence installation. (Collins Dep. at 37, 52-53).  Collins testified that he included Weldon Thomas because as far as Collins knew, Thomas had "never done anything besides run the Bush Hog," which mows grass and therefore is not used much during the winter, and Thomas was also not on the call-in list.  (Collins Dep. at 34, 39, 52-53).

The undersigned finds that Defendant has met its "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for deciding to lay off employees in November 2011 and for including Donnie Green and Weldon Thomas in those layoffs.

### 3.    Pretext

Because Defendant has articulated legitimate, non-discriminatory reasons for terminating Donnie Green and Weldon Thomas, to survive summary judgment, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Chapman v. AI Transp.*, 229 F.3d

1012, 1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns,*

*Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. 1997)).  The court's role at this

juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could find

them unworthy of credence."   *Combs*, 106 F.3d at 1538 (internal quotation

omitted).  In making the required pretext showing, "[a] plaintiff is not allowed to

recast an employer's proffered nondiscriminatory reasons or substitute his business

judgment for that of the employer."   *Chapman*, 229 F.3d at 1030.   Rather,

"[p]rovided that the proffered reason is one that might motivate a reasonable

employer, an employee must meet that reason head on and rebut it, and the

employee cannot succeed by simply quarreling with the wisdom of that reason."

*Id.*

The EEOC contends that Defendant's proffered reasons for terminating

Green and Thomas—"that budget issues necessitated a layoff," and that "Thomas

and Green were chosen because they were not as versatile as other employees"—

are pretextual "because there was no budget issue that required layoffs."  (Doc. 42

at 19).  The EEOC further argues that "[b]ecause there was no budget crisis, the

2011 Layoff was simply a subterfuge by Simonds to get rid of older employees,

and how Thomas and Green were chosen is irrelevant."  (*Id.*).  The EEOC relies on

the following evidence to show that the County's reliance on budget issues to justify the November 2011 layoffs is pretextual: (1) allegedly inconsistent statements by County personnel concerning the budget issues; (2) allegedly inconsistent statements by County personnel about the 2011 layoffs; (3) the ages of the employees who were laid off; (4) post layoff spending; and (5) age-related comments allegedly made by Simonds and Collis.  (*See* Doc. 42 at 4-16, 19-25). The undersigned addresses each category of evidence in turn.

### a.    <u>Evidence Concerning The County's Budget Problems</u>

Plaintiff contends that County officials have given inconsistent statements about the budget issues cited as the reason for the layoffs which create "a genuine issue of fact as to whether the alleged budget issue necessitating the 2011 Layoff is, simply, false."  (Doc. 42 at 19-20).

First, Plaintiff contends that Kirby "stated *unequivocally* that any issue with the 2012 budget revenues not being sufficient did not arise until mid-November 2011, after the 2011 Layoff," and that Kirby "testified *unequivocally* that the 'bad news' in the form of a decrease in revenues for 2012 was not learned of until mid-November 2011, well after the 2011 Layoff." (Doc. 42 at 20 (emphases added)). Thus, Plaintiff asserts that "the layoff could not have been based on a projected loss of revenue for 2012."  (*Id.*).  Kirby did testify that she realized in mid to late November that the revenues were not coming in as expected (*see* Kirby Dep. at

52), and viewed in isolation, that testimony arguably supports Plaintiff's contentions.  Kirby also indicated, however, that her estimation of when she made that realization was a "guess," that she would "have to go back and look at the minutes again," and that she could not "pinpoint the exact times" she informed Simonds that she thought there would be a revenue shortage.  (Kirby Dep. at 44, 49).

Additional testimony from Kirby as well as the Commissioner's meeting minutes Kirby referenced shed more light on when Kirby realized that revenue was coming up short and when the County took steps in response to that realization.  Kirby testified that once she realized there was a revenue shortfall, "we started looking for places to save money," and one of those ways was the refinancing of the bond.  (Kirby Dep. at 52-53).  The record shows that that process had begun no later than October 27, 2011, as evidenced by the minutes of the Commissioner's meeting that day during which Simonds called for a motion to approve Merchant's Capital to proceed with bond refunding costs and savings, which was the bond refunding of the courthouse and jail.  (*See* Doc. 51-15; Simonds Dep. at 137).  Moreover, when asked during her deposition how the County made up the difference between the budget and the revenue, Kirby responded, "Well, we refunded the bond and whatever other options the chairman took.  That was probably the layoff with the road department and maintenance and salaries."

35

(Kirby Dep. at 53).   Critically, Simonds, the person who approved the layoff, testified that he remembers thinking in September or October 2011 that he would need to tell the Road Department to cut expenses.  (Simonds Dep. at 47).  Thus, the undersigned finds that Plaintiff has not created an issue of fact on whether Chairman Simonds and Rita Kirby believed that County revenue was coming in lower than estimated and began looking at ways to cut expenses *prior to* the November 4, 2011 layoffs.

Citing Defendant's interrogatory responses and Chairman Simonds' testimony, Plaintiff also contends that the County has given inconsistent statements about "what the budget issue was" that allegedly precipitated the layoffs.  (Doc. 42 at 19-20).  Plaintiff asserts that "[i]t was either: (1) the Road Department was going over budget in 2011 (Simonds Dep., 42:5-21), or (2) the 2011 revenues were down (Simonds Dep., 107:25-108:15), or (3) cuts had to be made to ensure sufficient funds for the 2012 Budget (Ex. 1, Resp. 6)."  (Doc. 42 at 20).  In the County's discovery responses, the County explained why it instituted a reduction in force in November 2011:

> A reduction-in-force was implemented in November 2011 because the county was facing a revenue issue caused by, among other things, a reduction in revenue producing activities such as building permits. Moreover, the value of taxable property, the county's primary source of revenue, remained stagnant from 2009 to 2011.
>     The monthly operating expenses of Fannin County are in excess of a million dollars.  Historically and in keeping with good financial management, the County maintains a minimum of a one month fund

balance in reserve.  Because of the decline in revenue producing activities and the stagnant tax base, the county had to act proactively to ensure that it had sufficient funds for its fiscal year 2012 Budget. After a tax increase was eliminated as a possible remedy because of the adverse impacts it would have on the citizens of the county, the focus became reducing expenditures.  Because most functions of county government are not optional, Fannin County possessed little flexibility with respect to addressing the revenue anticipated for 2012. As a result, Chairman Simonds concluded that the county had to reduce the number of budgeted positions to address the budget issue.

(Doc. 42-3 at 6-7).  Kirby testified that she became aware after the proposed 2012 budget was published that there was an approximately $1.5 million shortfall in revenues from what had been estimated from the previous year, that she notified Chairman Simonds of that shortage, and they discussed ways to save the County money, including the refinancing of the bond on the courthouse.  (Kirby Dep. at 44, 53, 71-73, 77).  Simonds similarly testified that he became aware that the County had a million dollars in uncollected taxes and, in addition to other cost-cutting measures such as the refinancing of the courthouse and jail, cutting EMS overtime, changing the way that emergency services were sent to respond to emergencies, and waiting to buy new equipment, he began thinking in September or October 2011 that the Road Department needed to cut expenses and began talking to Collis and Collins about cutting expenses sometime between October and the end of the year.  (Simonds Dep. at 40-41, 44, 47, 49, 79-80, 108-09, 111-14, 136-40; *see also* Doc. 51-15).  The undersigned finds that Simonds' and Kirby's testimony does not contradict the County's explanation in its interrogatory

37

responses concerning the County's financial concerns and decision to pursue cost-cutting measures, including the November 2011 layoffs.

Plaintiff contends, however, that Simonds has given inconsistent reasons about whether he directed the Road Department to cut expenses because revenue was down, citing Simonds' testimony that he told Collins and Collis to cut expenses at the Road Department because that department was "over budget." (*See* Doc. 42 at 21; *see also* Simonds Dep. at 42).  When Simonds' testimony on that point is viewed in its entirety, it is clear that Simonds' concern about the Road Department's budget and belief that expenses need to be cut were intertwined with his concern about insufficient revenue; his explanations are not so inconsistent that Plaintiff has demonstrated pretext.

When questioned during his deposition about why he told Collins and Collis to cut expenses at the Road Department in 2011, Simonds explained that he told Collins and Collis to cut expenses because the Road Department was "over budget," but then explained that "another thing that plays into it, is our SPLOST fund," which "fluctuates back and forth."  (Simonds Dep. at 42).  He then explained further when asked whether SPLOST funds were an issue in 2011: "Everything in 2011 and '12 was an issue, it was down . . . .  The SPLOST – the allotment for SPLOST for a month was down.  Like I said, it's up and down. Wintertime is a bad time, our funds was down.  And the SPLOST for the month

was down, so . . . .” (Simonds Dep. at 43).  He further clarified that the SPLOST

fund was “[n]ot entirely” the reason he instructed Collis and Collins to cut

expenses: “[I]t was the whole thing from one end to the other.  Funds was down . .

. .  Our economy was flat.  We had a million dollars uncollected taxes.  Just one

thing after another.  And what we tried to do is make this thing work.” (Simonds

Dep. at 44).  Plaintiff’s attorney asked, “What are all the reasons why you told Mr.

Collins and Mr. Collis in 2011 to cut expenditures?” and Simonds responded,

“Well, that is money; funding, money.”  (Simonds Dep. at 44).  Simonds and

Plaintiff’s counsel then had the following exchange:

> Q:  A minute ago you said the only reason you told them [to cut
> expenditures] is because the road department was going over budget?
> A:  Well, they were going over budget.
> Q:  Now you’re saying there’s SPLOST issues too?
> A  No.  Well, that’s an issue.  All of it together is an issue.  Money is
> the issue.  You can do anything if you’ve got money . . . .
> Q  So, if you have more money coming in through SPLOST or
> whatever sources, the fact the road department was going over budget
> would not have been as big of an issue.
> A  Repeat that.
> Q  Sure.  If you had more money coming in through SPLOST funds
> and other funds, property tax collection, the fact that the road
> department was going over, as you said, over budget, would not have
> been as big of an issue?
> A  If we had money, nothing would be an issue.  I mean, we would
> work all the people in Fannin County, we would pave every road in
> Fannin County, but that ain’t the way it is.

(Simonds Dep. at 44-45).

The fact that Simonds used different phrasing to describe the County's bleak financial picture leading to the decision to lay off employees in November 2011 does not undermine his stated belief that in the fall of 2011 the County's revenue was dropping and that the Road Department needed to cut expenses, regardless of whether that issue is couched in terms of a "budget issue" or a "revenue issue." The budget for the County, including each of its departments, is directly correlated to how much revenue it has—whether from property taxes, sales tax, SPLOST, ad valorem taxes, licenses, permits, fees, etc.   If those revenues are less than anticipated, the County has less to spend and must adjust its budget accordingly, a hardly controversial proposition.

Plaintiff also contends that "there were no issue[s] with the 2011 revenue" because "Kirby and Simonds actually increased the projected budget revenues and expenditures in the fall 2011 for the 2012 budget based on how the revenues had been coming in during 2011 and an expected increase for 2012[.]"  (Doc. 42 at 20). While it is undisputed that the County drafted its 2012 budget based on optimistic revenue projections, Kirby explained that it was *after* the proposed budget was published when she learned that the revenue was approximately $1.5 million lower than expected.   Thus, the County's prior optimistic assessment of its anticipated revenues early in the budget process does not create an issue of fact on whether

officials perceived an unexpected drop in the revenue and a corresponding need for cost-saving measures after the budget was drafted.

Plaintiff also asserts that Simonds' explanation that the Road Department was over budget was "false." (Doc. 42 at 21). First, Plaintiff contends that Kirby "said it is impossible to tell whether the Road Department is going over budget during the year because of how the SPLOST funds are allocated at the end of the year to settle up differences between the amount budgeted for the Road Department out of the General Fund and how much was actually spent on the Road Department." (*Id.* (citing Kirby Dep. at 38-40)). Kirby explained that even when the Road Department appears to be going over the amount budgeted in the general fund for its operations, it is unknown until the end of the year by how much, if any, it has gone over its budget for the year because the Department can use a portion of SPLOST funds to pay back the general fund. (Kirby Dep. at 38). While that testimony shows how difficult it may be to determine whether or to what extent the Road Department may go over its budget by the end of the year, it does not show that Simonds did not perceive that the Road Department was spending more than revenues could support and needed to reduce its spending, *particularly* in light of the difficulties of ascertaining before the end of the year how much in SPLOST funds would be able to be used to pay back any deficits in general fund spending. (*See* Kirby Dep. at 29-31).

41

Plaintiff also cites deposition testimony of Road Department Superintendent Collins, Chairman Simonds, and Commissioner Sosebee in support of its assertion that Simonds' testimony that the Road Department was over budget was "false." (Doc. 42 at 21, 23).   First, Plaintiff asserts that Collins "said there was no emergency with the Road Department budget in 2011 that he was aware of[.]" (Doc. 42 at 21 (citing Collins Dep. at 31)).   In the first place, Simonds testified that the Road Department's budget was "over," not that there was a budget "emergency."   To the contrary, Simonds explained that he preferred to take action to cut expenses before reaching the "crisis point."   (Simonds Dep. at 79). Moreover, Collins' cited testimony does not support Plaintiff's characterization of that testimony.   Collins testified that the layoffs "hinged on the budget at the time. I wasn't privy to any of that information, how far it went."   (Collins Dep. at 31). He also responded when asked whether there was an issue with the Road Department budget, "I'm not sure.  Possibly could have been."   (*Id.*).   He also testified that he thought that they "may have went over just a little," that the Road Department "goes over budget a little pretty much every year is what I think," although he is "not privy to th[at] information[.]"   (*Id.*).   Collins testimony therefore does not show that Simonds' explanation that the Road Department was over budget was "false" as Plaintiff asserts.

42

Next, Plaintiff contends that "Simonds said that as of October 5, 2011, when the 2011 Layoffs were being discussed, Fannin County's finances look[ed] pretty good." (Doc. 42 at 21 (citing Simonds Dep. at 147-48)). When shown an October 5, 2011 weekly general fund balance that showed that the County had $1,284,192.52 in the fund, Simonds testified "It means at that point in time of the year we're doing pretty good if we've still got a million dollars left, but that's not – no easy task to do." (Simonds Dep. at 147). When asked, "based on this document, the county is doing pretty well?" Simonds responded, "Yeah, we are. We don't borrow money. We make the payroll." (Simonds Dep. at 147-48). Simonds' belief that the County was "doing well" to have enough money to make payroll and not have to borrow money does not undermine his belief that the Road Department was over budget, and that when informed that the County had a shortage in the projected revenue collection from what had been collected the previous year, it was necessary to cut Road Department expenditures. As the EEOC observed about the October 5, 2011 general fund report, "This is a weekly report, so the numbers could have been completely different the next week." (Pl. resp. to Def. SMF ¶ 56 (in response to Kirby's observation that the general fund was a "little low" at that point, and she would hope to have around $2 million in the general fund at that point (Kirby Dep. at 63-64)).

Plaintiff's reliance on the testimony of Commissioner Sosebee (*see* Doc. 42 at 24 (citing Sosebee Dep. at 24, 55-57)) is similarly selective and misplaced. Sosebee testified that Fannin County was not having any budget issues in 2011 and was not spending more than it expected to (Sosebee Dep. at 24), but he admitted that revenues were lower than expected and that the County had experienced an economic downturn in 2010 and 2011 (*id.* at 24-25).  Even if Sosebee believed that the overall County expenditures were not exceeding the amount budgeted for 2011, his testimony does not controvert Simonds' expressed belief that the Road Department was over budget and that its spending needed to be reduced when faced with a revenue shortage.  Plaintiff also asserts that Sosebee "does not recall one meeting in 2011 where the discussion of layoffs was raised," and "recalls no meetings where there was any concern about the budget, i.e., how much was being spent," in an apparent attempt to imply that no such discussions took place.  (Doc. 42 at 23 (citing Sosebee Dep. at 55-57)).   Sosebee's inability to recall such meetings does not mean they did not occur, however, nor does it indicate that *Simonds* did not actually believe that the Road Department was over budget or that the County's revenue had fallen.[16]

---

[16] Plaintiff also asserts that "Simonds should have consulted Sosebee about the layoff, but he did not" (Doc. 42 at 23 (citing Sosebee Dep. at 12)), but Plaintiff's reliance on that testimony is again selective.  Sosebee testified that Simonds should have consulted with the Commissioners about whether to conduct the layoffs and that the Commissioners felt "left out," but he also testified that Simonds "has the

Finally, even if Kirby or Simonds were mistaken about the County's financial position or its need to engage in cost-saving measures, a plaintiff does not succeed in showing pretext by establishing that the decision-maker "was mistaken about the facts upon which [it] based [its] alleged non-discriminatory decision." *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002); *see also Dawson v. Henry Cnty. Police Dep't*, 238 Fed. Appx. 545, 549 (11th Cir. 2007) (unpublished decision) ("The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue.") (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  To establish pretext, a plaintiff must offer evidence "from which a reasonable jury could find that the defendant did not honestly believe the facts upon which [it] allegedly based [its] non-discriminatory decision." *Id.* (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).  Plaintiff has failed to make that showing here.

### b.    <u>Statements Concerning The Layoff Process</u>

---

sole right to hire and fire" and had no obligation to consult with the Commissioners about that decision.  (Sosebee Dep. at 12-13).  Sosebee also testified that he did not know about the layoffs until they had occurred (Sosebee Dep. at 13), an assertion that appears at odds with the Board of Commissioner's minutes for the October 27, 2011 meeting attended by Commissioner Sosebee, where Commissioner Webb expressed "concerns for the 17 employees at the road department being laid off."  (Doc. 46-2).  Sosebee did not remember that the layoffs were discussed at that meeting.  (Sosebee Dep. at 49-51).

Plaintiff contends that "[f]urther demonstrating the 2011 Layoff was a ruse, no one can even agree on how or why employees were selected for the 2011 layoff." (Doc. 42 at 22). Plaintiff focuses on immaterial inconsistencies between the accounts of Simonds, Collis, and Collins with respect to the layoff process in an effort to create an issue of fact on how employees were selected for the layoff. First, Plaintiff points to purported inconsistencies between Simonds' testimony that he did not tell Collins and Collis to cut employees, just their budget, and Collins' testimony that Simonds "told them they needed to lay off employees, and to figure out which employees they could spare during down times." (Doc. 42 at 22 (citing Simonds Dep. at 98 and Collins Dep. at 22)). Simonds testified that he did not tell Collis and Collins to "fire employees" or "to reduce the head count," but instructed them to "cut expenses." (Simonds Dep. at 98). Elsewhere, Simonds testified, "I didn't tell them to cut employees, I told them – not only employees, I told them to cut everywhere they could." (Simonds Dep. at 41; *see also id.* at 44 ("And you keep saying that I told Mr. Collins and Mr. Collis to cut employees. It's not employees only, it's everything across the board, whatever, and gas.")). Regardless of the exact wording Simonds used to convey to Collins the need to cut expenses, Collins clearly understood that he was to identify employees to be laid off, consistent with layoffs he had done in the past. It is further uncontroverted

that regardless of whether or not Simonds told Collins and Collis to cut employees as part of their efforts to cut expenses, Simonds approved the layoffs.

Plaintiff also asserts that Simonds "claims that Collis and Collins came up with the list of names and brought the list to him and he merely signed off on it," and Collins "claims it was *he and Collis* [who] came up with the list," but Collis "says he had nothing to do with determining how many or who was laid off," that "[h]e was just called to a meeting with Simonds and Collins who had already come up with the list of employees and he was asked questions about who did what." (Doc. 42 at 22 (citing Simonds Dep. at 48 and Collis Dep. at 67, 87-88)).  The uncontroverted evidence shows that Collins and Simonds asked Collis about what certain of the Road Department employees did, and Collis provided them information about the employees.  *Collins* then identified the employees to be laid off, and Simonds approved that list without making any changes.  Plaintiff has not pointed to any evidence that anyone other than Collins decided who would be included on the list, that Collins used any other criteria than the considerations discussed above, or that Simonds made any changes to Collins' selections.  The minor variations in the witnesses' accounts of these events are immaterial and insufficient to create an issue of fact on pretext.

Finally, Plaintiff points to a purported conflict over whether Simonds told Collins and Collis that the November 2011 layoffs would be permanent and

contends that "Simonds, the final decision maker, misled Collis and Collins about his true intentions regarding the layoff, but now attempts to distance himself from the decision." (Doc. 42 at 22-23). Specifically, Plaintiff asserted that "Simonds claims he told them that the 2011 Layoff was going to be permanent, [but] Collins says Simonds said the layoff would be 'for a little while' and then he would bring them back." (*Id.* citing Simonds Dep. at 78 and Collins Dep. at 43)). Simonds testified that he told Collins and Collis that the layoff list they provided him was going to be a permanent layoff. (Simonds Dep. at 78). In response to the question, "But did you tell them that if you include employees in a layoff, that's going to be a permanent layoff?" Simonds replied, "Yeah, they – yeah, it was understood." (*Id.*). Collins testified on the other hand that he received the same instructions from Simonds for the November 2011 layoffs as he had for the past seasonal layoffs, i.e., "[t]o see who you could get by without for a little while until the budget gets back on track, and then we would bring them back." (Collins Dep. at 43). He also testified that he did not recall if Simonds or the other Commissioners told him in advance the layoffs were going to be permanent, that he "did not perceive it as a permanent layoff at the time," and he did not find out that they were going to be permanent until November, although Simonds had discussed the month before "that they possibly could be." (Collins Dep. at 28-30). The undersigned finds these discrepancies, i.e., whether Simonds told Collins that the

layoffs were to be permanent, or whether Collins understood them to be only temporary, do not create a genuine issue of material fact on whether Defendant's reasons for terminating Green and Thomas are pretextual.[17]

Critically, none of the differences in the witnesses' accounts identified by Plaintiff create an issue of fact on the following: Simonds directed the Road Department to cut expenses (regardless of whether he specified that it needed to be done by layoffs); Collins consulted with Collis about certain of the Road Department employees and what equipment they operated; Collins then identified employees who primarily operated seasonal equipment and lacked the versatility offered by other employees who were cross-trained on multiple equipment, held certifications and licenses, and volunteered for the after-hours call-in list; and Simonds approved those selections. Regardless of the discrepancies in how the layoff list was created as outlined by Plaintiff, Plaintiff has not shown that in selecting employees for inclusion on the list, Collins did not focus on the seasonal nature of his employees' work, and the ability of his employees to multitask and to offer more versatility in a contracting workforce. Nor has Plaintiff created on issue

---

[17] The undersigned acknowledges, as the EEOC points out, Chairman Simonds testified that he believed that the employees who were laid off left "on their own," even though he also acknowledged that they were laid off permanently. (*See* Simonds Dep. at 50, 90-92, 117). That opinion appears to be based on his impression that they did not later seek to return to their jobs. (*Id.* at 91). That belief, as mistaken and frankly confusing though it may be, does not constitute evidence of pretext. It is undisputed that the employees were terminated pursuant to the November 2011 layoffs, and Simonds approved those layoffs.

of fact concerning the reasons Collins selected Donnie Green and Weldon Thomas for the layoff list, i.e., they primarily operated equipment that was not as much in use during the winter, i.e., the bush hog and the motor grader, they did not cross-train on other equipment, they did not possess certifications in flagging or soil and erosion control, and they did not volunteer for the call-in list.  Certainly none of the discrepancies in the witnesses' testimony evidence that they made any of their decisions because of Thomas's or Green's ages.

Although not discussed by Plaintiff as evidence of pretext, the undersigned notes that Collins testified that one of the reasons Green was laid off was because he intended to retire.  (*See* Collins Dep. at 37, 52; *see also* Collis Dep. at 70).  Even if Defendant took into account Donnie Green's retirement intentions when deciding which employees to lay off, that consideration does not, by itself, evidence that Defendant discharged Green because of his *age.  See Dilla v. West*, 179 F.3d 1348 (11th Cir. 1999).

In *Dilla*, the district court had rejected ADEA claims brought by older plaintiffs who were turned down for an air traffic controller position because they would be eligible to retire sooner than the person who was hired, and they would require a higher salary than the successful applicant because they were at a higher pay grade.  *Id.* at 1349.  The district court found that "[b]oth of these factors are directly correlated with age—older workers are generally (but not necessarily)

50

closer to meeting federal retirement criteria and further advanced in their pay grade than younger workers." *Id.* But relying on the Supreme Court's decision in *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993),[18] the district court "concluded that 'the mere fact that there exists a perfect correlation, or even a direct link, between age and the factor purportedly relied upon by the employer does not perforce mean that the employer has impermissibly relied on age.' " *Id.* (quoting *Dilla v. West*, 4 F. Supp. 2d 1130, 1142-43 (M.D. Ala. 1998)). The Eleventh Circuit "agree[d] with the district court's analysis of *Hazen Paper*: Reliance on factors correlated with age does not by itself constitute age discrimination." *Id.* The court acknowledged that "purported reliance on such factors may be a pretext for discrimination; if so, the defendant has violated the ADEA." *Id.* But "[t]he district court . . . concluded on the basis of substantial evidence that no such pretext was involved in this case," and therefore the Eleventh Circuit affirmed the judgment. *Id.*

Here, even if there is a correlation between Green's retirement and his age, the undersigned finds that Defendant's reliance on his stated intention to retire as a factor in deciding to lay him off "does not by itself constitute age discrimination." The Road Department was tasked with cutting its workforce, and Collins'

---

[18] In *Hazen Paper*, the Court considered the question of "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age," and "clarify[ied] that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." 507 U.S. at 608-09.

consideration of Green's impending retirement does not indicate that Collins included him on the layoff list because of his age as opposed to Green's belief (whether mistaken or not) that he was going to be leaving the workforce anyway, similar to an employee who states his intention of leaving his employer for any other reason such as an intent to move away, return to school, etc.  Nor is there evidence that that reliance was a pretext for age discrimination. That is especially so where it is undisputed that Green met Collins' other criteria for determining who to lay off, i.e., operated seasonal equipment, etc.

### c.     The Ages Of Employees Laid Off

Plaintiff asserts that "this is not a statistical proof case," but contends that "it is easy to draw reasonable inferences from the fact that every full-time Road Department employee 64 or older was laid off in November or December 2011, and the three oldest bush hog operators and the oldest motor grader operator wer laid off."  (Doc. 42 at 23-24; *see also* Pl. SMF ¶ 22, 24, 27).  Plaintiff also notes that "[t]he average age of the eleven people laid off from the Road Department in November 2011 was 59.55," and asserts that "[i]f only those employees who were hired and not-rehired are included, the average age of the people laid off from the Road Department in November 2011 was 62.875."  (Pl. SMF ¶¶ 124-125). Although the EEOC purports not to rely on a statistical analysis, that appears to be what it wants the Court to do, i.e., find pretext by considering the average age of

the laid-off employees.   "Statistical proof or other evidence of a pattern of terminating older workers may be used" to demonstrate that an employer made decisions based on age, "[h]owever, to be accepted, statistical calculations must come from a witness, not a party's lawyer."   *Mitchell*, 504 Fed. Appx. at 870. Moreover, "[a]bsent any analytical foundation, statistical evidence is 'virtually meaningless, and thus, cannot have any probative value."   *Id.* (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004)).   The ages of the employees who were terminated, by themselves and without any analytical foundation, do not show that Defendant's articulated reason for conducting the layoffs or for selecting Green and Thomas are pretext.   *See, e.g.*, *Wilson*, 376 F.3d at 1089 (finding that evidence that only 2 of 44 vice presidents were female was "not even probative of pretext because [the plaintiff] has not provided any other relevant information, including the number of women who expressed interest in vice president positions"); *Lee v. GTE Fla.*, 226 F.3d 1249, 1255 n.2 (11th Cir. 2000) (finding data about the number of women decisionmaker hired "statistically meaningless" in the absence of data on the number of qualified, female applicants for the positions in question).

As already discussed, Plaintiff has not presented evidence that creates an issue of fact on whether Chairman Simonds believed that the Road Department needed to cut its budget due to a decline in revenue, on whether Collins created a

list of employees to be included in the layoff based on the criteria discussed above, or on whether he included Green and Thomas for the reasons previously addressed. Plaintiff has not shown that younger employees were retained in spite of the fact that they primarily operated seasonal equipment, were not cross-trained on other equipment, did not have certifications or licenses such as in flagging, soil and erosion, or a CDL, and did not volunteer for the call-in list. Thus, the Court cannot make a meaningful "statistical" comparison between the employees who were retained and those who were laid off based on their relative ages for purposes of determining that Plaintiff has demonstrated pretext.

### d.   Post Layoff Spending

Plaintiff also points out that the County gave raises in January 2012 which were approved as part of the 2012 budget (*see* Doc. 42 at 5, 9-10), and in January 2012, Defendant began hiring employees in the Road Department, all of whom were under 60 "with an average age of 45.9 years" (*id.* at 24). Plaintiff has not shown, however, that the giving of raises or hiring of employees in 2012 shows that Simonds did not believe in 2011 that the County's revenue was declining or that he did not believe that the Road Department's expenses did not need to be cut. As Plaintiff acknowledges, "Toward the end of December 2011 or early January 2012, the revenues actually started coming in better than expected, so the budget did not need to be adjusted." (Doc. 42 at 7; *see also* Kirby Dep. at 64-66). Thus,

expenditures in 2012, such as hiring of additional personnel or the issuance of pre-approved raises, do not undermine Simonds' belief in the fall of 2011 that expenses needed to be cut.

Citing *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354 (11th Cir. 1999), Plaintiff also contends that the hiring of 10 younger employees in 2012, "all under the age of 60, with an average age of 45.9 years," after having laid off seven employees over the age of 60, shows that Defendant's reasons for laying off these employees is pretext for age discrimination. (Doc. 42 at 24). In *Damon*, the court found that issues of fact precluded summary judgment where a district manager replaced four employees over 40 with four managers under 40 in a one year period. 196 F.3d at 1361. The court wrote, "we believe that this pattern of firing and demoting so many older workers and replacing them with younger workers, by the relevant decision-maker during the same time period, constitutes probative circumstantial evidence of age discrimination." *Id.*. The court also relied on other evidence, however, that "underscored" the "probative value" of that evidence, including evidence that the defendant had begun advertising for new store managers even though there were no vacancies and began interviewing younger candidates; the decisionmaker began issuing undeserved reprimands or disciplinary actions against the older managers; the decisionmaker made the statement that he "wanted 'aggressive, young men' like himself to be promoted" right after

terminating one of the older managers; and the plaintiffs had "offered evidentiary support by which a reasonable jury could conclude that the specific reasons for termination given by [the defendant] were a pretext." *Id.* at 1361-66. That case is easily distinguishable from this case.

Here, Plaintiff has failed to demonstrate that the County's reasons for conducting the November 2011 layoffs or selecting Green and Thomas were pretextual as discussed above.  Nor has it offered evidence of comments made by Simonds or Collins that indicate that they bore a discriminatory animus toward Green or Thomas because of their ages, as discussed below.  Nor has Plaintiff shown that the younger employees hired in 2012 were sufficiently comparable to Green or Thomas such that their hiring in the winter months of 2012 creates an issue of fact on whether Defendant's reasons for including Green and Thomas in the layoffs were pretextual.  That is, Plaintiff has not shown that, like Green and Thomas, the new employees worked primarily on seasonal equipment, lacked certifications or licenses such as for flagging, soil and erosion control, or CDLs, were not cross-trained on multiple pieces of equipment, and did not volunteer to be included on the call-in list for deployment during weather-related emergencies.

### e.   **Age-Related Comments**

Neither Collins nor Simonds said anything to cause Green to believe that he was selected for the 2011 RIF because of his age.  (Def. SMF ¶¶ 78-79).  Similarly,

Thomas did not hear Collins or Simonds say anything to cause him to believe that he was selected for the RIF because of his age.  (Def. SMF ¶¶ 80-81).  Plaintiff asserts, however, that "[t]here is other evidence that age was a factor in the 2011 Layoff," including comments Simonds and Collis made to other people about the layoffs.  (Doc. 42 at 14).  Specifically, the wife (then girlfriend) of Tommy Loudermilk, one of the employees laid off in 2011, testified that she called Simonds to discuss the layoff, and Simonds told her that Loudermilk was "fixing to retire" and that one of the other men who was laid off was also drawing Social Security.[19]  (Declaration of Janice Loudermilk, Doc. 42-22 at ¶ 3).  As discussed above, however, even if the decisionmakers considered factors that might correlate to age, such as employees' participation in retirement plans or receipt of retirement or Social Security benefits, those considerations do not show that they made the layoff decisions because of *age*.  *Dilla*, 179 F.3d at 1349.

Plaintiff also cites the Declaration of Shane Ware, the son of Gene Ware, one of the laid off employees.  (Doc. 42 at 14).  Mr. Ware testified that after his father was terminated, he (Shane) asked Phillip Collis "why he got rid of my father," and Collis responded, "He was in bad health and too old to work." (Declaration of Shane Ware, Doc. 42-44 at ¶ 3).[20]  As already discussed, Collis did not decide which employees to include on the layoff list.  To the extent that Shane

---

[19] Simonds disputes that account.  (*See* Simonds Dep. at 131, 179-80).
[20] Collis disputes that account.  (Collis Dep. at 121).

Ware's testimony shows that Collis considered Gene Ware's age in giving input to Collins and/or Simonds on which employees to include in the layoffs, the evidence does not indicate that Collis considered Green's or Thomas's ages in giving his input, i.e., believed them to be "too old to work," or that Collins or Simonds considered Green's or Thomas's ages in selecting them for the layoffs. Thus, Plaintiff has not shown that Collis's alleged discriminatory animus concerning Gene Ware's age was the "but for" cause i.e., "determinative influence" on Collins' decision to include Green and Thomas in the layoff list or Simonds' decision to approve that list. *See Sims*, 704 F.3d at 1334-37 (rejecting "cat's paw" argument in ADEA case).   Accordingly, the undersigned finds these alleged comments to be insufficient to show that Defendant's reasons for conducting the November 2011 RIF or layoffs and for including Donnie Green and Weldon Thomas in the layoffs were pretextual.

In summary, the undersigned finds that the EEOC has not created an issue of fact on whether Defendant's legitimate, non-discriminatory reasons for laying off Green and Thomas were pretext for age discrimination, and therefore, the EEOC's ADEA claim does not survive summary judgment under the *McDonnell Douglas* burden-shifting framework.

C.    ***Smith v. Lockheed* Analysis**

Although the EEOC quotes *Smith's* "convincing mosaic of circumstantial evidence" standard as an alternative to the *McDonnell Douglas* framework (*see* Doc. 42 at 17), it does not elaborate on how the evidence in this case creates such a "mosaic" or address that standard in any further detail.  (*See generally* Doc. 42). For the reasons discussed above, the undersigned finds that Plaintiff's allegations are insufficient to create an inference that age was the "but for" cause of Donnie Green's and Weldon Thomas's termination. *See, e.g.*, *Flowers v. Troup Cnty*, 1 F. Supp. 3d 1363, 1381 (N.D. Ga. 2014) (noting that "most of the evidentiary tiles [the plaintiff] proffers were discarded as insufficient or irrelevant in considering his other arguments against summary judgment" and "cannot now be reassembled to create a convincing mosaic of discriminatory intent").  The EEOC has not created an issue of fact on whether the County conducted the November 2011 layoffs as a "ruse" to terminate employees because of age.  It has not pointed to evidence that Collins, who was over 60 when the layoffs occurred, included Green and Thomas on the layoff list because of their ages, as opposed to the criteria to which he testified he considered.  Nor has it pointed to evidence that Simonds, who was over 70 when the layoffs occurred, approved the layoff list based on employees' ages.

The undersigned notes that when asked whether he looked at the ages of the employees who were being laid off, Simonds responded, "Nope.  Like I say, that

didn't matter to me.  These guys are young fellas to me."  (Simonds Dep. at 135).
The undersigned acknowledges that the decisionmakers' ages are not
determinative, but they undermine a finding that the EEOC has created a
"convincing mosaic of circumstantial evidence" that Simonds and Collins
discriminated against Green and Thomas because of their age, particularly in the
absence of any other evidence presented in this case from which a reasonable juror
could make that finding.  *See, e.g.*, *Ehrhardt v. Haddad Rest. Grp., Inc.*, 443 Fed.
Appx. 452, 456 (11th Cir. 2011) (unpublished decision) (noting that "the
individuals who made the decision to demote and ultimately terminated Ehrhardt,
were within the class of people protected by the [Alabama Age Discrimination in
Employment Act]" and citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471
(11th Cir. 1991) for the proposition that "the plaintiff's burden to show the
discharge is motivated by age is more difficult when the decisionmaker is also
within the class protected by the ADEA"); *Fuller v. Edward B. Stimpson Co.*, 971
F. Supp. 2d 1146, 1168 (S.D. Fla. Aug. 30, 2013) ("[W]hile not determinative, it is
worth noting that the Review Team that made the decision to include Fuller in the
RIF was comprised of individuals who were all over the age of forty."); *Waldemar
v. American Cancer Soc'y*, 971 F. Supp. 547, 556 (N.D. Ga. 1995) (finding that
fact that the decisionmaker was "a man in his sixties [and] was older than plaintiff"
added to "the court's conclusion that a jury could not find that [his] actions were

60

motivated by unlawful discrimination"); *Langston v. Carraway Methodist Hosps. of Ala., Inc.*, 840 F. Supp. 854, 866 (N.D. Ala. 1993) ("Furthermore, the fact that six of eight members of the reorganization committed were within the protected age group coupled with the fact that the two ultimate decisionmakers were ages 59 and 82, suggests, not that they were likely to discriminate but, in fact, suggests the opposite.").

Thus, even after drawing all reasonable inferences in favor of the EEOC, the undersigned finds that it has failed to create an issue of fact on whether Defendant terminated Donnie Green and Weldon Thomas because of their age.  Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**.

## CONCLUSION

It is **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 36) be **GRANTED**.  The Clerk is **DIRECTED** to terminate referral of this matter to the undersigned magistrate judge.

**IT IS SO REPORTED AND RECOMMENDED** this <u>16th</u> day of <u>July</u>, 2015.

<u> /s/ *J. Clay Fuller*</u>
J. CLAY FULLER
United States Magistrate Judge